IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CATALYST ADVISORS )
INVESTORS GLOBAL INC. and )
CHRISTOS RICHARDS, )
            )
       Plaintiffs, )
            )
       v. )     C.A. No. N20C-06-080 AML CCLD
            )
CATALYST ADVISORS, L.P., )
            )
       Defendant. )

Submitted: December 7, 2023
Decided: March 28, 2024

## POST-TRIAL MEMORANDUM OPINION

Neil R. Lapinski, Esquire, Phillip A. Giordano, Esquire, Madeline R. Silverman, Esquire, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware, *Attorneys for Plaintiffs Catalyst Advisors Investors Global Inc. and Christos Richards.*

Lisa Zwally Brown, Esquire, Samuel L. Moultrie, Esquire, GREENBERG TRAURIG, LLP, Wilmington, Delaware, Richard Angowski, Jr., Esquire, Sean Rose, Esquire, OLENDER FELDMAN LLP, Summit, New Jersey, *Attorneys for Defendant Catalyst Advisors, L.P.*

**LEGROW,** Justice[1]

---

[1] Sitting as a Judge of the Superior Court of the State of Delaware by special designation of the Chief Justice of the Supreme Court of Delaware pursuant to Del. Const. Art. IV § 13(2).

Two former partners in a limited partnership that operates as a boutique recruiting firm challenge the partnership's calculation of their share of the profits in the year that they left the partnership and the price they are entitled to receive for their partnership units. Both calculations are based on bespoke contractual language contained in the limited partnership agreement and the partners' profit-sharing policy.

There are two primary issues in this case. First, do certain changes to the profit-sharing policy adopted in the weeks leading up to the plaintiffs' dissociation from the partnership apply to the plaintiffs, who argue they left the partnership before the changes were fully implemented? As to this issue, the plaintiffs' attempt to avoid the policy modifications would require the Court to eschew the partnership agreement's unambiguous language in favor of extrinsic evidence. That result contradicts fundamental, uncontroverted legal principles, and the plaintiffs therefore failed to carry their burden regarding this aspect of their breach of contract claim.

The second primary issue requires the Court to determine the partnership's Enterprise Valuation, a contractually defined term used to calculate the buyout price for partnership units. The partnership had commissioned just such a valuation seven months before the plaintiffs' exit, and all the partners accepted and relied on that valuation to determine a new partner's buy-in. A reasonable course might have been for the parties to rely on that valuation to determine the plaintiffs' buyout price.

But—perhaps predictably given the level of animosity between the parties—that is not the course that either side selected. Instead, each side obtained a valuation that failed to follow the contractual definition of Enterprise Valuation, resulting in unreliable figures that artificially inflated or depressed the partnership's value. Because neither litigation valuation follows the contractually agreed methodology, the Court instead adopts the valuation the parties obtained before the plaintiffs' departure.

For the reasons that follow, the Court finds that the partnership properly calculated the plaintiffs' share of the 2019 profits but erred in calculating the plaintiffs' buyout price.

## I. FACTUAL BACKGROUND[2]

The Court conducted a five-day bench trial. During trial, the Court heard from and considered the testimony of the following witnesses: Simon Bartholomew, Christos Richards, John Archer, Francis P. Egan, Randall Martin Paulikens, Alyson Archer, and Tom Theurkauf. The parties also submitted 100 joint trial exhibits.[3]

---

[2] This post-trial decision cites: C.A. No. N20C-06-080 AML CCLD docket entries (by "D.I." number); trial exhibits (by "JX" number); the trial transcript ("Trial Tr." by day "I–V"); deposition transcripts lodged by the parties (by witness last name); stipulated facts set forth in the parties' Joint Pre-Trial Order ("PTO"), D.I. No. 88; and the parties' Post-Trial Opening Briefs ("Opening Br.") and Post-Trial Answering Briefs ("Answering Br.").

[3] To the extent the parties raised objections in the joint exhibit list that were not raised at trial or in post-trial briefing, those objections are deemed waived.

These are the facts as the Court finds them after weighing the testimony and exhibits admitted during trial.[4]

## A.    The Parties and Relevant Non-Parties

Defendant Catalyst Advisors, L.P. ("Catalyst" or the "Company") is a Delaware limited partnership with its principal place of business in New York, NY.[5] Plaintiff Catalyst Advisors Investors Global, Inc. ("CAIG") is a Delaware corporation.[6]  Plaintiff Christos Richards ("Richards" and collectively with CAIG, "Plaintiffs") is an individual and a resident of California.[7]  Richards was a limited partner of Catalyst from 2014 to October 4, 2019.[8]

CAIG's sole shareholder is a United Kingdom company, Bartholomew Advisors Ltd. ("Bartholomew Advisors").[9]  Simon Bartholomew, who resides in

---

[4] In reaching its verdict, the Court has examined all exhibits submitted and has considered the testimony of all witnesses, both direct and cross, live and by deposition.  The Court has also considered the applicable Delaware case law that has defined the legal precepts applicable to the claims and defenses the parties have raised.  The Court has applied the Delaware Rules of Evidence to the testimony and exhibits and only relied on evidence that would be allowed under those rules—consistent with the Court's knowledge of those rules and the specific rulings that may have been made and articulated both pre-trial and during the trial proceedings.  And, of course, the Court has considered each party's respective arguments on the weight to be accorded the testimony and evidence.

[5] PTO § II(A)(1).

[6] PTO § II(A)(4).

[7] PTO § II(A)(2).

[8] PTO § II(A)(3).

[9] PTO § II(A)(5).

London, England, is the majority shareholder of Bartholomew Advisors and holds 100% of its voting rights.[10]

## B.    Catalyst's formation and growth

Catalyst is an executive recruiting and assessment firm specializing in recruiting senior executives and board members to companies in the biopharmaceutical and medical technology industries.[11]  John Archer founded the business as Catalyst Advisors, LLC in 2008, and the company employed three people at its inception.[12]  In 2014, Catalyst Advisors, LLC converted to Catalyst (the limited partnership).[13]  Catalyst's limited partners included John Archer, Alyson Archer (John Archer's spouse), Stephen Williams, Richards, and CAIG (represented by Bartholomew).[14]  A substantial portion of the partners' compensation came from the annual distribution of the company's profits.  The company's End-of-Year Bonus Policy defined how that compensation was calculated and apportioned among the partners.

---

[10] PTO § II(A)(6).

[11] Trial Tr. II at 181.

[12] *Id.* at 182–84.

[13] *Id.* at 188.

[14] Trial Tr. I at 20, 165–66; Trial Tr. II at 188.

4

## C. Catalyst's Limited Partners Execute the LPA in 2018

In 2018, Catalyst added two limited partners: Arnaldo De Lisio and Sara Hager.[15]  Upon their admission, a new limited partnership agreement (the "LPA") was executed with a January 1, 2018 effective date.[16]  The LPA governed the relationship between the limited partners and Catalyst and is the operative document in this litigation.[17]

Before the partners signed the LPA, Alyson Archer created and circulated a PowerPoint presentation that purported to explain the agreement's key terms (the "LPA Slide Deck").[18]  At trial and in post-trial briefing, Plaintiffs relied on a bullet point on one slide, which referred to a resigning partner being "grandfathered" into the End-of-Year Bonus Policy that was in place at the time of the partner's departure. The parties dispute the relevance of this slide deck, which was admitted into evidence at trial.[19]

## D. Gilbert Forest Joins Catalyst in 2019

In 2019, Gilbert Forest joined Catalyst, buying in as a limited partner.[20] Contemporaneously with Forest's admission into the partnership, Alyson Archer

---

[15] Trial Tr. I at 21, 166.

[16] *Id.* at 21–22, 167; JX 1.

[17] JX 1 § 3.1.

[18] JX 46; Trial Tr. I at 23–24, 169–70.

[19] *See* JX 46.

[20] Trial Tr. I at 35, 50, 166.

presented a slide deck entitled "Overview for Gilbert Forest," which outlined founding equity partner compensation.[21] The slide deck made no mention of "grandfathering."[22]

## E. Valuation Reports

Before the partners executed the LPA, Sun Business Valuations, LLC ("Sun") conducted multiple valuation analyses for Catalyst.[23] In January and February 2018, after the LPA went into effect, Sun prepared another series of valuation analyses.[24] These reports were created to value the Company at the time it was formed and to account for the investment capital contributions of two partners, Sarah Hagar and Arnaldo De Lisio.[25] In May 2019, the summer before CAIG and Richards' dissociations, Sun prepared a further valuation analysis which had an effective date of December 31, 2018.[26] The May 2019 Sun Reports were prepared to update the Company's value in connection with Gilbert Forest's buy-in.[27] After CAIG and Richards dissociated, Sun prepared another series of valuations in August and

---

[21] The slide deck is dated February 12, 2018, but facts suggest it was presented in 2019 based on when Gilbert joined the partnership. JX 68; Trial Tr. I at 50–51.

[22] JX 68.

[23] JX 11; JX 12.

[24] JX 16; JX 17; JX 19.

[25] *See* Trial Tr. I at 34–35; Trial Tr. III at 14–15, 24, 268.

[26] The Report dated May 16, 2019, was a draft. JX 21. The Report dated May 25, 2019, was the final version. JX 22.

[27] *See* Trial Tr. I at 35; Trial Tr. III at 14–15, 198, 206, 269–71; Trial Tr. IV at 176.

September 2020.[28] These valuations purported to value Catalyst as of the date of Plaintiffs' respective dissociations.

In addition to those valuations, Wipfli LLP, under the direction of Plaintiffs' expert, Francis Egan, conducted a fair market value business valuation of Catalyst after CAIG and Richards dissociated (the "Egan Report").[29] The Egan Report is dated September 1, 2021, but purported to establish Catalyst's Enterprise Valuation using the Adjusted Book Value Method as of October 31, 2019.[30]

## F.    Key Provisions in the LPA

The LPA contains several provisions relevant to the current litigation. The LPA established an Operating Committee ("Committee") that managed Catalyst alongside its Managing Partner, John Archer.[31] The only members of the Committee

---

[28] *See* JX 26 (calculating the buyout price for Richards on October 4, 2019 at $1,480,798.47 and the buyout price for Bartholomew on October 21, 2019 at $776,613.91); JX 27 (calculating the buyout price for Richards on October 4, 2019 at $1,607,068 and the buyout price for Bartholomew on October 21, 2019 at $925,946). The September 10, 2020 Sun Report calculated the Enterprise Value of Catalyst as of October 4, 2019 at $871,016 and a Buyout Price of $1,745,170 for Richards and as of October 21, 2019 an Enterprise Value of $817,811 and a Buyout Price of $833,767 for Bartholomew. JX 28. The September 11, 2020 Sun Report calculated the same Enterprise Value and Buyout Prices as the September 10 Report. JX 29. The September 15, 2020 Sun Report calculated the same Enterprise Value of Catalyst as the two prior reports but had a Buyout Price of $1,745,151 for Richards and $833,779 for Bartholomew. JX 30. At trial, Theurkauf did not coherently explain the differences between these valuations, stating instead that the valuations resulted from an "iterative process" by which he would work with an attorney and an accountant when completing the report. Trial Tr. IV at 188–89. *See also* Trial Tr. III at 271 (explaining which reports reflect the "final report").

[29] JX 61.

[30] *Id.*

[31] JX 1 § 4.2(a).

7

were Catalyst's limited partners, and, as such, there was no distinction between a "partner meeting" and a "Committee meeting."[32]

The LPA defines when a partner dissociates and establishes the formula to determine a partner's buyout price following dissociation.[33] Section 8.1 "embodies the [] intentions" when a partner dissociates.[34] Section 8.2 describes the ways that a partner may dissociate, stating:

> A Partner shall cease to be a Partner upon the earliest of any of the following events (each, a "**Dissociation**", with the Partner that is the subject of the Dissociation begin referred to as the "**Dissociating Partner**"): (1) Disability, (2) death, (3) resignation/retirement, (4) termination for Cause, (5) termination for Other Cause; or (6) termination without Cause. . . .[35]

Once a partner dissociates, a buyout of the partner's units is not automatic. Section 8.4 explains the purchase of partnership units following a partner's dissociation.[36] Section 8.4 states: "[t]he Company shall have the ongoing right to purchase the Dissociated Partner's Units as set forth in this Section 8.4."[37] In the instance of dissociation upon resignation, as occurred in the instant case, Section

---

[32] *See* JX 1 § 4.2(a)(1); Trial Tr. II at 237.

[33] *See* JX 1 § 8 *et seq.*

[34] JX 1 § 8.1.

[35] JX 1 § 8.2.

[36] JX 1 § 8.4.

[37] *Id.*

8.4(a) allows, but does not require, Catalyst or its remaining partners to purchase the dissociated partner's units at the "Buyout Price."[38]

Section 8.4(e) specifies the process by which a buyout is initiated:

> The Company, or the Partners, as applicable, shall exercise its right to purchase the Dissociating Partner's Units by written notice to the Dissociating Partner specifying: (i) the Buyout Price, and any adjustments thereto; (ii) the date of closing on the purchase; and (iii) any other conditions applicable to such purchase as are permitted herein. Upon receipt of such notice the Dissociating Partner shall have the absolute obligation to sell such Units of the Company, or the Partners, as applicable.[39]

Section 8.4(f) goes on to describe the "Notice of Exercise" and states that:

> The Company shall have the first right to exercise the right to purchase the Dissociating Partner's Units, which shall be triggered by any Partner making written demand upon the Company to do so. If the Company fails to provide written notice of its exercise of such right within thirty (30) days of the written demand by a Partner, then the Partners shall have the right to exercise the right to purchase the Dissociating Partner's Units on a pro-rata basis.[40]

The LPA also establishes a formula for the buyout price of a partner's units. Section 8.2 states that "[t]he purchase price for a Partner's equity following a Dissociation will be determined in accordance with Section 8.5."[41] Section 8.5(a) states that "[t]he Buyout Price shall be calculated in accordance with Exhibit C,

---

[38] JX 1 § 8.4(a).

[39] JX 1 § 8.4(e).

[40] JX 1 § 8.4(f).

[41] JX 1 § 8.2.

subject to adjustment as set forth in Section 8.4 and this Section 8.5."[42]  Exhibit C

contains the following Buyout Price Formula:

> The Buyout Price of a Partner's Units shall be calculated by multiplying the Enterprise Valuation by the Partner's Participation Percentage.
>
> > \* "Enterprise Valuation" is determined as set forth in the Agreement.
> >
> > \* "Partner's Participation Percentage" is calculated by taking the average of the Partner's Profit Distribution Percentage over the immediately prior 5 years (or such shorter time if the dissociating Partner has dissociated prior to the 5th anniversary of becoming a Partner at the Company) from the date of dissociation.
> >
> > \* "Profit Distribution Percentage" means the percentage of Partner Distributable Income (as set forth in the Policy) that is distributed to a Partner pursuant to the End of Year Bonus Policy ("Policy").[43]

The LPA defines "End-of-Year Bonus Policy" as "the policy adopted by the

Company that determines the allocation and distribution of Profit to the Partners."[44]

The End-of-Year Bonus Policy is used to calculate each limited partner's Partner

Distributable Income ("PDI"), which is part of the Profit Distribution Percentage

that is used to calculate the Partner's Participation Percentage ("PPP").[45]

---

[42] JX 1 § 8.5(a).

[43] JX 1, Ex. C.

[44] JX 1 § 2.29.

[45] PTO § II(B)(15).

The other part of the buyout equation, Catalyst's Enterprise Valuation, also is defined in the LPA. The LPA states that "Enterprise Valuation":

> means the appraised value of the Company, as illustrated by and in accordance with the methodology set forth in the Sun Valuation report on file with the Company, as may be updated from time to time, or as may be superseded by an appraisal report following the same methodology issued by another appraisal Company. [46]

## G.    The August 2019 Committee Meeting

In 2019, as certain partners left the partnership and new partners joined, the partnership began discussing changes to its compensation structure. According to Catalyst's position in this litigation, the changes were at least partially driven by a concern that certain partners, including Plaintiffs, were operating in a manner that maximized their individual compensation at the expense of Catalyst's profitability.

On August 8, 2019, Catalyst's limited partners[47] and its counsel, Kurt Olender of OlenderFeldman LLP, attended a Committee/Partner meeting.[48] At the meeting, the partners received and discussed a PowerPoint presentation addressing certain compensation issues.[49] It was Alyson Archer's practice to edit a PowerPoint during partner meetings to capture discussions that took place; these edits were highlighted

---

[46] JX 1 § 2.30.

[47] Catalyst's limited partners and the Committee consisted of: Christos Richards, CAIG (Bartholomew), John Archer, Alyson Archer, Stephen Williams, Gilbert Forest, and Arnaldo De Lisio. PTO § II(B)(14).

[48] PTO § II(C)(31); Trial Tr. I at 87, 94, 201.

[49] JX 34; Trial Tr. I at 85–86, 201–02; Trial Tr. IV at 77.

in green and circulated to the partners after the meeting.[50]  Guided by the

PowerPoint, the partners discussed a series of changes to the End-of-Year Bonus

Policy.  Relevant to the current dispute, the partners discussed three changes to the

End-of-Year Bonus Policy that were intended to address: (1) long-in-the-tooth

("LIT") searches, (2) difficult searches, and (3) unpaid invoices.  According to the

LPA, changes to the End-of-Year Bonus Policy required approval from a majority

of the Committee including the Managing Partner.[51]

### 1.     The LIT Modification

The proposed LIT Modification would take a deduction from a recruiting

partner's origination credit (an input for the PDI calculation) for LIT searches.[52] LIT

search projects were search projects open past the guaranteed limit in Catalyst's

proposal letter with its clients, and the deduction would apply to all searches open

as of August 8, 2019, as well as any new searches started after that date.[53]  The

---

[50] *See e.g.*, JX 34; Trial Tr. I at 85–87, 203–04; Trial Tr. IV at 5, 83–84.

[51] JX 1 § 4.3(f) ("**Decisions Requiring Approval of a Majority of the Committee including the Managing Partner.** The Company shall not take any of the following actions without the majority approval of the Committee which shall include the approval of the Managing Partner: . . . (f) Changing the End-of-Year Bonus Policy.").

[52] *See* JX 34 at CATALYST003308; Defendant's Opening Br. at 14.

[53] JX 34 at CATALYST003308; Trial Tr. I at 90–95, 203–06; Trial Tr. II at 227.

Committee passed the LIT Modification by a 4-3 vote.[54] Richards and Bartholomew voted against the LIT modification.[55]

The partners agreed to a two-step implementation process for the modification.[56] In step one, a subcommittee—excluding the originating partner—would identify searches that would be considered LIT.[57] In step two, a final decision would be reached regarding how that LIT search should be addressed (*e.g.*, cancelled, charge-back to the originating partner, or permitted to continue).[58]

## 2.     Difficult Searches

"Difficult Searches" were defined as: "broken searches" (a search that did not succeed previously with a different recruiting firm); a search project with a retainer or final fee under Catalyst's minimum requirements; a search project open for more than a year; or a search project with a company that had particular issues that would make the search challenging.[59] The proposed Difficult Search Modification would re-allocate a portion of the recruiting partner's profit share (their total PDI) from the

---

[54] JX 34 at CATALYST003308 ("No= Simon, Christos, Arnaldo. Yes= Steve, Gilbert, John, Alyson.").

[55] *Id.*

[56] *Id.*

[57] *Id.*; Trial Tr. I at 90–95, 203–11; Trial Tr. II at 227; Trial Tr. IV at 5–15, 153–55, 164–66.

[58] JX 34 at CATALYST003308; Trial Tr. I at 90–95, 203–11; Trial Tr. II at 227; Trial Tr. IV at 5–15, 153–55, 164–66.

[59] JX 34 at CATALYST003314; Trial Tr. I at 97–99, 210; Trial Tr. II at 45–46, 242–44; Trial Tr. IV at 98–101.

originating partner to non-partners who were assigned to work on "Difficult Searches."[60]   The Committee passed the Difficult Search Modification by a 7-0 vote.[61]

### 3.   Unpaid Invoice Deduction

The proposed Unpaid Invoice Deduction effectively required Partners to guarantee payment of their client's invoices.[62]   The proposal called for a deduction from the originating partner's PDI for unpaid invoices.[63]   The Committee passed the Unpaid Invoice Deduction by a 7-0 vote.[64]

## H.   September Meetings

The Partners convened another meeting on September 3, 2019, to discuss: "YTD Overview of Firm Performance, Review of Decisions from [August] Meeting, [and] Searches to Be Reviewed."[65]   A subcommittee was formed and met on September 6, 2019, to review changes to the Operating Agreement, discuss

---

[60] JX 34 at CATALYST003315; Trial Tr. I at 97–99, 210; Trial Tr. II at 45–46, 242–44; Trial Tr. IV at 98–101.

[61] JX 34 at CATALYST003314–15.

[62] JX 34 at CATALYST003310.

[63] *Id.*

[64] *Id.*; Trial Tr. II at 232–35.

[65] JX 35 at CATALYST000151; Trial Tr. II at 249–52; Trial Tr. IV at 103–07.

proposals, and review searches.[66] The Committee met again on September 16, 2019, and reviewed the subcommittee's work.[67]

**I.    The Plaintiffs' dissociations and the October 2019 Committee Meeting**

The parties stipulated before trial that Richards dissociated from Catalyst on October 4, 2019.[68]

The Committee held another meeting on October 21, 2019.[69] At this meeting, the Committee discussed implementing a policy requiring recruiting partners to achieve a certain minimum origination credit in order to participate in the Partner Compensation Plan.[70] The Committee discussed a proposal that would measure a partner's origination metrics over a three-year period. If a recruiting partner failed to meet the minimum origination criteria, he or she only would be compensated based on their individual performance (the "Minimum Origination Requirement").[71] The parties dispute what occurred during the vote on this revision to the End-of-Year Bonus Policy. Having received testimony and reviewed the evidence, the Court concludes that Bartholomew—who was participating remotely—disconnected from

---

[66] JX 36 at CATALYST000110; Trial Tr. II at 256–58; Trial Tr. IV at 108–11.

[67] JX 37 at CATALYST000139–43; Trial Tr. I at 102–04; 223Trial Tr. II at 258–59; Trial Tr. IV at 114–15.

[68] PTO § II(A)(3); Trial Tr. I at 174, 193; JX 79.

[69] JX 43.

[70] *Id.* at CATALYST000972.

[71] *Id.* at CATALYST000976.

15

the meeting in the middle of the vote.[72]   The record does not show by a preponderance of the evidence that Bartholomew announced that CAIG was dissociating from the partnership "effective immediately."  Even if he made such a pronouncement, however, it was not an effective means of dissociating before the policy modification was approved, as explained in the analysis section below.

On October 28, 2019, Bartholomew, on behalf of CAIG, sent the Partners a letter requesting that Catalyst purchase CAIG's partnership units.[73]  The letter stated that CAIG resigned on October 21, 2019.[74]  Bartholomew sought a buyout under Section 8.5 of the LPA.

Three days later, on October 31, 2019, Richards sent a letter requesting that the partners or Catalyst purchase his units under Section 8.5 of the LPA.[75]  The letter noted that this "formal request" followed his October 4, 2019 resignation.[76]

In two letters dated April 30, 2020, Catalyst provided proposals to Richards[77] and Bartholomew (on behalf of CAIG)[78] to buy out their ownership units in Catalyst and pay 2019 PDI due under the LPA.  Plaintiffs rejected Catalyst's buyout because

---

[72] Trial Tr. I at 113; Trial Tr. II at 263, 270.

[73] Trial Tr. I at 28; JX 78.

[74] JX 78.

[75] Trial Tr. I at 174; JX 79.

[76] JX 79.

[77] JX 33.

[78] JX 42.

16

they disagreed with the price calculations.[79]  In May 2020, Catalyst responded to both Richards[80] and Bartholomew[81] with another letter.  Each letter outlined the recipient's respective PDI for fiscal year 2019 according to Catalyst.[82]  Following receipt of these letters and amidst ongoing disagreements as to the buyout price, the Plaintiffs initiated this action.

**J.  CAIG and Richards File This Action**

CAIG and Richards filed their complaint on June 5, 2020, asserting one count for breach of contract.[83]  On September 22, 2020, Plaintiffs filed for an Entry of Default Judgment against Catalyst under to Superior Court Rule 55(b)(1).[84]  On October 1, 2020 Plaintiffs dismissed all claims against Catalyst Advisors, LLC under Superior Court Rule 41(a)(1)(I) because the complaint incorrectly identified that entity as the general partner of Catalyst Advisors, L.P.[85]

On October 6, 2020 Catalyst moved to vacate the default judgment under Superior Court Civil Rule 60(b).[86]  Plaintiffs responded to Catalyst's motion on

---

[79] Trial Tr. I at 29, 175.

[80] JX 69.

[81] JX 70.

[82] JX 69; JX 70; Trial Tr. I at 28–31.

[83] D.I. No. 1.

[84] D.I. No.7.

[85] D.I. No. 8.

[86] D.I. No. 10.

17

October 23, 2020.[87]  On October 29, 2020, the Court heard argument,[88] granted the motion with amendments, and issued an order vacating the default judgment.[89]

Catalyst filed a Motion for Partial Summary Judgment on October 29, 2021, which the Court denied on February 10, 2022.[90]  The Court held a five-day virtual bench trial from December 12, 2022 through December 15, 2022, with a final day of trial on January 27, 2023.[91]  Plaintiffs and Defendant filed their respective Post-Trial Opening Briefs on June 27, 2023,[92] and their respective Post-Trial Answering Briefs on August 1, 2023.[93]  The Court heard post-trial oral argument on December 7, 2023.[94]

## II.    PARTIES' CONTENTIONS

The parties dispute what amounts are owed to Richards and CAIG as a result of their respective dissociations, including the 2019 compensation and the Buyout Price.  Those disputes generally fall into two categories: (1) the proper calculation of Partner Distributable Income ("PDI") and Partner's Participation Percentage

---

[87] D.I. No. 13.

[88] D.I. No. 18.

[89] D.I. No. 19.

[90] PTO § XI(13); D.I. Nos. 63, 78.

[91] D.I. Nos. 115–18.

[92] D.I. No. 106, 107.

[93] D.I. Nos. 111, 112.

[94] D.I. No. 121.

("PPP"), and (2) the meaning and calculation of Enterprise Valuation. The parties also dispute whether CAIG had a positive capital account balance and whether Plaintiffs are entitled to an award of attorneys' fees.

## A. The Parties' Contentions Regarding PDI and PPP

Plaintiffs raise three issues related to calculating PDI and PPP. First, Plaintiffs argue that there is no evidence that the policy changes adopted during the August 8, 2019 or October 21, 2019 Committee meetings were finalized and implemented, and, as such, they should not be included in the End-of-Year Bonus Policy.[95] Second, and relatedly, Plaintiffs argue that they are "grandfathered" into the End-of-Year Bonus Policy that existed before any modifications, such that any changes approved but not fully implemented at the time of Plaintiffs' dissociation did not apply to them.[96] Third, Plaintiffs contend that in calculating PPP, the phrase "immediately prior 5 years" does not include the year the partner dissociated.[97] Plaintiffs therefore argue that their PPP should be calculated based on their respective Partner Profit Distribution Percentage in 2014-2018.[98]

Catalyst responds that the policy changes considered during the August 8, 2019 and October 21, 2019 Committee meetings were approved in accordance with

---

[95] Plaintiffs' Opening Br. at 56–57.

[96] *Id.* at 50–51.

[97] PTO § II (B)(25)(a).

[98] *Id.*

the LPA.[99]  Catalyst asserts that the LPA does not require any additional steps to modify the Policy, and those changes therefore should be reflected in the End-of-Year Bonus Policy and PDI calculations even if the policy modifications were not fully "implemented" at the time the Plaintiffs dissociated.  In response to Plaintiffs' "grandfathering" argument, Catalyst argues that the term "grandfather" is not located in the LPA and only appears on one slide in the LPA Slide Deck,[100] which was circulated before the LPA's execution and was not integrated into the LPA.[101]  Finally, Catalyst states that the phrase "immediately prior 5 years" is inclusive of the year when the Partner dissociates, and Plaintiffs' PPP therefore should be calculated based on the years 2015 through 2019.[102]

## B.    The Parties' Contentions Regarding Enterprise Valuation

As to Enterprise Valuation, the parties vigorously dispute the meaning of Enterprise Valuation within the LPA and which of the proffered valuation reports fits that definition.  Unfortunately, neither party's position on this issue engages with the contractual language or the factual record in a satisfactory way.  The parties disagree as to which experts the Court should rely on, which report should be used

---

[99] Defendant's Answering Br. at 10–11, 15, 18–19.

[100] JX 68 at CATALYST000031.

[101] Defendant's Answering Br. at 13–14.

[102] PTO § II (B)(25)(b).

when calculating Enterprise Valuation, and what report was "on file" with the Company for purposes of Plaintiffs' claim.

Plaintiffs contend that under the LPA's definition of Enterprise Value, the report "on file" at the time of their dissociation is the May 16, 2019 Sun Valuation Report.[103] Catalyst argues that the report "on file" is the September 15, 2020 Sun Valuation Report (the "2020 Report").[104]

Plaintiffs further argue that the Court should rely on the Egan Report when calculating Enterprise Valuation for purposes of the breach of contract claim.[105] Catalyst counters that Plaintiffs fail to identify support in the evidentiary record or under the LPA for their proposed Enterprise Valuation and reiterate that Enterprise Valuation should be calculated using the 2020 Report that Catalyst offered at trial.[106]

Plaintiffs argue that the Court should not consider Randall Paulikens' expert report and testimony with respect to any calculation of Enterprise Valuation because he was a rebuttal expert.[107] Catalyst argues that Paulikens offered admissible evidence that opined on the issues to which Plaintiffs' expert (Egan) testified.

---

[103] Plaintiffs' Opening Br. at 18, 27.

[104] Defendant's Answering Br. at 20.

[105] Plaintiffs' Opening Br. at 26.

[106] Defendant's Answering Br. at 20; JX 30.

[107] Plaintiffs' Opening Br. at 41–47; PTO § XI(19).

21

Catalyst contends that Paulikens did not seek to provide any expert opinion as to Catalyst's Enterprise Valuation.[108]

## C. The Parties' Contentions Regarding Positive Capital Account Balance

Plaintiffs argue that Catalyst failed to credit CAIG with the balance in his capital account, arguing the account contained $79,181 based on a statement to that effect in the 2020 Report.[109] Catalyst, on the other hand, asserts that CAIG's 2019 Schedule K-1 confirms that CAIG did not possess a positive balance in its capital account upon its dissociation and that tax documents are the most reliable indicator of CAIG's account balance.[110] Further, Catalyst argues that Plaintiffs fail to meet their burden to establish that CAIG possessed a positive balance in his capital account.[111]

## D. The Parties' Contentions Regarding Fee Shifting

Finally, Plaintiffs contend that Catalyst engaged in bad faith litigation that warrants fee shifting.[112] In Plaintiffs' view, the logic that permits fee shifting when a party "knowingly assert[s] frivolous claims" should extend to the assertion of frivolous defenses, which is how Plaintiffs categorize Catalyst's defense of the

---

[108] Defendant's Answering Br. at 28–31; PTO § XI(20).

[109] Plaintiffs' Opening Br. at 19–20; Plaintiffs' Answering Br. at 2; JX 30 at 18.

[110] Defendant's Answering Br. at 32–33.

[111] *Id.*

[112] Plaintiffs' Opening Br. at 37–40.

claims in this case.[113]  Catalyst disputes that it engaged in bad faith litigation, arguing that normal litigation strategy and opposing Plaintiffs' claim does not amount to conduct that rises to the level of bad faith.[114]

### III.  ANALYSIS

The parties' dispute focuses on the 2019 compensation and Buyout Price to which CAIG and Richards are entitled.  Their disputes challenge—and the Court's analysis addresses—the correct inputs for the Buyout Price Formula established in Exhibit C to the LPA.  A visual graphic of this formula provides that:

$$Buyout\ Price = Enterprise\ Valuation\ x\ Partner\ Participation\ Percentage$$

$$Partner\ Participation\ Percentage = \frac{sum\ of\ PPDP^{115}\ from\ last\ 5\ years}{5}$$

$$PPDP = \%\ of\ PDI^{116}\ distributed\ pursuant\ to\ the\ End-of-Year\ Bonus\ Policy$$

### A.  Partner's Profit Distribution Percentage over the immediately prior 5 years

The parties disagree about the share of Catalyst's 2019 profits to which CAIG and Richards are entitled as well as the proper method for calculating PPP.[117]  To reiterate, PPP is an input to the Buyout Price Formula and "is calculated by taking

---

[113] *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998).

[114] Defendant's Opening Br. at 38.

[115] Partner's Profit Distribution Percentage.

[116] Partner Distributable Income.

[117] PTO §II(B)(9).

the average of the Partner's Profit Distribution Percentage over the immediately prior 5 years (or such shorter time if the dissociating Partner has dissociated prior to the 5th anniversary of becoming a Partner at the Company) from the date of dissociation."[118] The "'Profit Distribution Percentage' means the percentage of PDI (as set forth in the Policy) that is distributed to a Partner pursuant to the End-of-Year Bonus Policy ('Policy')."[119]

For purposes of this formula, the parties disagree as to the calculation of Plaintiffs' 2019 PDI and the meaning of the phrase "the immediately prior 5 years" in the definition of PPP. Although Catalyst alternatively argues that it "is entitled to a directed verdict on the calculations of 2019 PDI because Plaintiffs failed to provide competent testimony establishing the amount they claim entitlement to[,]" the Court does not reach that issue because, as explained below, the Court does not agree with Plaintiffs that Catalyst erred in calculating 2019 PDI.[120]

### 1. Catalyst properly calculated Plaintiffs' 2019 PDI with the changes to the Policy adopted at the August 9, 2019 and October 21, 2019 Committee meetings.

CAIG and Richards assert claims for their "share of Profits in the year of Dissociation as of the date of Dissociation," and they contend that the calculation of

---

[118] JX 1, Ex. C.

[119] *Id.*

[120] Defendant's Opening Br. at 30.

those profits, *i.e.*, PDI, should not reflect the Policy modifications the partners adopted in August and October 2019.[121] Plaintiffs make this argument without any apparent regard for the contractual confines of their partnership agreement. The LPA places very few limits on how Catalyst's partners may adopt and amend the Policy. Specifically, the LPA provides that "**'End-of-Year Bonus Policy'** means the policy adopted by the Company that determines the allocation and distribution of Profit to the Partners."[122] The End-of-Year Bonus Policy can be changed by a vote of a simple majority of the Committee, provided that the Managing Partner is within the majority.[123] The LPA provides: "**Decisions Requiring Approval of a Majority of the Committee including the Managing Partner.** The Company shall not take any of the following actions without the majority approval of the Committee which shall include the approval of the Managing Partner: . . . (f) Changing the End-of-Year Bonus Policy."[124]

With respect to the End-of-Year Bonus Policy, Plaintiffs argue that there is no evidence that the policy changes voted on during the August 8, 2019 or October 21, 2019 Committee meetings were finalized and implemented before their respective

---

[121] JX 1 §8.5(a).

[122] JX 1 § 2.29.

[123] JX 1 § 4.3(f).

[124] *Id.*

dissociations.[125]  Catalyst contends that there is sufficient evidence to demonstrate that the policy changes were adopted upon voting, which is all that the LPA requires.[126]  In addition, Catalyst argues that the record shows that the partners implemented the modifications in accordance with their agreed-upon procedure.[127]

### a. The LIT and Difficult Search Modifications.[128]

Both the LIT and Difficult Search Modifications adopted by the Committee in August 2019 had the potential to reduce a partner's distributable income if the partner consistently relied on less-profitable searches.  The LIT Modification reduced a recruiting partner's origination credit (an input for the PDI calculation) for LIT searches.[129]  The Difficult Search Modification reallocated to non-partners a

---

[125] Plaintiffs' Opening Br. at 56–57.

[126] Defendant's Opening Br. at 38–40.

[127] Defendant's Answering Br. at 12–13 (citing JX 34; JX 35; JX 36; JX 37; Trial Tr. II at 250, 256; Trial Tr. IV at 103–04, 108, 110, 114, 116, 121–26).

[128] It is Plaintiffs' burden to prove that the LIT and Difficult Search Modifications were not applicable.  *See* Plaintiffs' Opening Br. at 54 (citing *Tanyous v. Happy Child World, Inc.*, 2008 WL 2780357, at *1, *8 (Del. Ch. July 17, 2008) ("Because there is no signed writing detailing exactly what was agreed to, the Court must ascertain the shared intent of the parties to determine what, if any, changes were made to the End-of-Year Bonus Policy.").  Catalyst notes that Plaintiffs' reliance on *Tanyous* is misplaced because the facts are distinguishable from the present case. Catalyst asserts that "[h]ere, the Court has the benefit of the one plaintiff and two defendants' testimony and Catalyst PowerPoints which confirm there were votes taken to modify the Policy[,]" and as such there is no burden shifting.  Defendant's Answering Br. at 10 n.3.  There is no factual dispute as to the occurrence of the vote and the Court therefore holds that it is the Plaintiffs' burden to prove their claim.

[129] *See* JX 34 at CATALYST003308; Defendant's Opening Br. at 14.

portion of a recruiting partner's profit share (their total PDI) for searches categorized as "difficult."[130]

Catalyst argues that the LIT Modification was an effort by Catalyst "to incentivize more equitable conduct" and encourage partners to seek out projects that would benefit all in the partnership.[131] Catalyst notes that the LIT and Difficult Search Modifications "resulted in multiple partners, not just Richards, receiving deductions consistent with the modifications for search projects that met the criteria."[132]

Plaintiffs assert that the LIT Modification was a policy "meant to penalize Mr. Richards."[133] Plaintiffs further contend that "the policy was never implemented prior to Mr. Richard's dissociation" because the "two-step process" was not completed before he dissociated. Plaintiffs therefore argue that the LIT Modification cannot be considered when calculating Richards' and CAIG's 2019 PDI.[134] Similarly, Plaintiffs argue that "a subcommittee was never formed" as called for in the notes added to the PowerPoint slide regarding the Difficult Search Modification.

---

[130] JX 34 at CATALYST003315; Trial Tr. I at 97–99, 210; Trial Tr. II at 45–46, 242–44; Trial Tr. IV at 98–101.

[131] Defendant's Answering Br. at 15.

[132] *Id.*

[133] Plaintiffs' Opening Br. at 7.

[134] *Id.* at 8 ("[A] subcommittee was never formed nor was a meeting held by September 7, 2019. And prior to Richards' dissociation, there was never a discussion among the partners as to what percentage charge-back to allocate against the originator on LIT searches.").

Accordingly, Plaintiffs maintain that the Difficult Search Modification was never implemented and cannot be considered when calculating their PDI.[135]

Catalyst responds that the Committee passed both modifications at the August 8, 2019 Committee meeting in accordance with the LPA.[136] Catalyst asserts that the facts presented at trial demonstrate that "Catalyst (a) took a vote to modify the Policy to implement the Difficult Search Modification and LIT Modification, (b) implemented those Modifications immediately by forming a subcommittee which met on September 6th and identified qualifying search projects which were discussed over the next several Committee meetings."[137] Given these facts, Catalyst argues that the LIT Modification and Difficult Search Modification were adopted on August 8, 2019, before Plaintiffs dissociated, and those modifications appropriately were reflected in Catalyst's calculation of Plaintiffs' 2019 PDI.

The Court finds that both the LIT Modification and the Difficult Search Modification were properly included in Plaintiffs' 2019 PDI calculation. According to the LPA, changes to the End-of-Year Bonus Policy required approval from a majority of the Committee, including the Managing Partner.[138] At the August 8,

---

[135] *Id.* at 9.

[136] Defendant's Answering Br. at 11.

[137] *Id.* at 12.

[138] JX 1 § 4.3(f) ("**Decisions Requiring Approval of a Majority of the Committee including the Managing Partner.** The Company shall not take any of the following actions without the

28

2019 Committee meeting, the Committee passed the LIT Modification by a 4-3 vote and the Difficult Search Modification by a 7-0 vote.[139] The Managing Partner voted in favor of both modifications.[140] No further steps were required under the LPA to modify the Policy.

The fact that the policy changes could not be "implemented" immediately does not preclude their application to Plaintiffs because the operative vote occurred before they dissociated from the partnership. The LPA does not require "implementation" for a change to the End-of-Year Bonus Policy to take effect, and any such limitation would not be logical in the context of Catalyst's business. The record shows that Catalyst finalizes annual partner compensation under the Policy after the calendar year closes.[141] In that sense, Catalyst could never "implement" a Policy modification before the end of the year. Nothing in the LPA, the Policy, or the parties' testimony suggests that a partner could avoid the effect of Policy modifications by resigning at any time before the annual compensation was finalized.

---

majority approval of the Committee which shall include the approval of the Managing Partner: . . . (f) Changing the End-of-Year Bonus Policy.").

[139] JX 34 at CATALYST003308, CATALYST003314–15.

[140] *Id.*

[141] Trial Tr. IV at 135–36; JX 38.

To the extent Plaintiffs rely on the implementation process agreed upon at the August 2019 meeting as a prerequisite to the modifications becoming effective, the record similarly does not support that position. At the August 2019 meeting, the parties agreed to a method to identify LIT or difficult searches.[142] There is nothing in the record to suggest approval or effectiveness was contingent on that process or that the partners could not later change the process by agreement. If the partners deviated from that process, there is no record that Plaintiffs objected to that deviation at the time. And, to the extent any purported deviation occurred after their dissociation, Plaintiffs forfeited the opportunity to challenge the implementation by dissociating before the process was complete. In any event, the record shows by a preponderance of the evidence that the Committee took the agreed-upon steps toward implementation.[143]

### b. Unpaid Invoice Deduction.

The Unpaid Invoice Deduction ensured that partners guaranteed payment by their clients.[144] The policy introduced the following two changes:

> [1] If a client fails to pay a retainer or final fee after one year, the payment will be deducted from a Partner's PDI (and credited once client payment is received)

---

[142] JX 34 at CATALYST003308, CATALYST003314–15; Trial Tr. I at 90–95, 203–11; Trial Tr. II at 227; Trial Tr. IV at 5–15, 153–55, 164–66.

[143] JX 34; JX 35 at CATALYST000176–79; JX 36 at CATALYST000126–29; JX 37 at CATALYST 000139–43; Trial Tr. I at 94–102, 152–53, 204–05; Trial Tr. II at 92, 227–29, 256, 259–61, 291; Trial Tr. IV at 7–8, 14, 16–23, 61, 103–04, 108, 110, 114–117, 121–26.

[144] JX 34 at CATALYST003310.

[2] If a client fails to pay an expense for 6 months, the expense will be allocated to a Partner's [business development] account (and credited once client payment is received).[145]

The Committee passed the Unpaid Invoice Deduction by a 7-0 vote.[146] Plaintiffs nevertheless assert that the "partners discussed guaranteeing client payments on a going-forward basis[]" and the policy had not been implemented when Plaintiffs dissociated.[147] Catalyst counters that all that was needed to pass the Unpaid Invoice Deduction was a majority vote that included the Managing Partner, and that voting requirement indisputably was met.[148] As such, Catalyst contends that the Unpaid Invoice Deduction was in effect upon Richards' dissociation and a $467,996.42 deduction therefore properly was taken from his PDI.[149]

Like his argument regarding the LIT and Difficult Search Modifications, Richards' interpretation of the record and the LPA is not persuasive. The LPA does not require implementation for the policy modification to be in effect. There is no dispute that the modification was approved by a vote consistent with the LPA.[150] Richards' trial testimony regarding prospective application finds no support in the

---

[145] *Id.*

[146] *Id.*; Trial Tr. II at 232–35.

[147] Plaintiffs' Opening Br. at 10.

[148] Defendant's Answering Br. at 15.

[149] *Id.* at 16; JX 38; JX 40.

[150] JX 34 at CATALYST003310; Trial Tr. II at 232–35.

record and was unconvincing. Richards' contention that he could have paid the unpaid invoices himself to avoid at least a portion of this penalty misses the point; Richards voluntarily dissociated and in so doing surrendered the opportunity to blunt the modifications' effect.[151] The Court finds that the Unpaid Invoice Deduction was in effect when Richards and CAIG dissociated, and Catalyst properly included those deductions in calculating Plaintiffs' 2019 PDI.

### c. Minimum Origination Requirement

At the October 21, 2019 Committee meeting, the Committee approved the adoption of a minimum origination requirement for recruiting partners to participate in the Partner Compensation Plan.[152] The Minimum Origination Requirement set certain metrics to measure origination over a three-year period.[153] If a recruiting partner failed to meet the minimum origination criteria, they would be compensated based only on their individual performance.[154]

Plaintiffs argue that the "proposed changes to the End-of-Year Bonus Policy discussed at the October 21, 2019 meeting related to underperforming partners [were] never actually implemented. . . and [were] contrived to force CAIG to

---

[151] Richards also testified that some of the invoices in question were actually paid or not pursued in good faith by Catalyst. This convoluted testimony was neither convincing nor adequately supported by Catalyst's contemporaneous records.

[152] JX 43 at CATALYST000972.

[153] JX 43.

[154] *Id.*

resign."[155] Plaintiffs contend that this is evidenced by the fact that Catalyst did not apply the modification to Alyson Archer.[156]

Catalyst argues that CAIG's reliance on Alyson Archer's compensation is unavailing because—as the firm's sole non-recruiting partner—she always was compensated differently under the Policy.[157] Further, Catalyst asserts that the Plaintiffs fail to "identify a cognizable basis under the LPA or in the evidentiary record to show that the Minimum Origination Requirement is invalid or inapplicable . . . and the Court must conclude that CAIG's 2019 PDI is $430,332."[158]

To resolve this aspect of the parties' dispute, the Court must determine whether CAIG's mid-meeting verbal dissociation exempts it from the Minimum Origination Requirement's application. Neither party's argument is compelling on this issue, leaving the Court to consider the LPA without the benefit of the parties' considered input.

The LPA's plain language does not expressly state how a partner dissociates or, relatedly, when such dissociation becomes effective. In the absence of specific language creating a dissociation procedure, the Court considers Delaware's Limited Partnership Act and the LPA's more general provisions. To begin, Delaware law

---

[155] Plaintiffs' Opening Br. at 55; Plaintiffs' Answering Br. at 18–19.

[156] Plaintiffs' Opening Br. at 54–55; Plaintiffs' Answering Br. at 18–19.

[157] Defendant's Opening Br. at 38–40; Defendant's Answering Br. at 17–18.

[158] Defendant's Opening Br. at 38–40; Defendant's Answering Br. at 19.

prohibits a limited partner from withdrawing from the partnership before dissolution and winding up, except as provided in the partnership agreement.[159] The LPA plainly contemplates that Catalyst's partners may dissociate, but it does not specify how a partner may do so.[160] The LPA does, however, require that all notices and communications required or provided for by the LPA be in writing.[161]

Although the LPA does not expressly say so, a partner necessarily would need to communicate his or her dissociation to the partnership. But under the LPA, verbally announcing dissociation, as CAIG claims it did on the October 21, 2019 call, would not be a sufficient method of communication.[162] CAIG's dissociation was not effective until it sent written notice, which occurred after the meeting and the vote adopting the policy change.[163] As such, the Minimum Origination

---

[159] *See also* 8 Del. C. § 17-603 ("A limited partner may withdraw from a limited partnership only at the time or upon the happening of events specified in the partnership agreement and in accordance with the partnership agreement. Notwithstanding anything to the contrary under applicable law, unless a partnership agreement provides otherwise, a limited partner may not withdraw from a limited partnership prior to the dissolution and winding up of the limited partnership. Notwithstanding anything to the contrary under applicable law, a partnership agreement may provide that a partnership interest may not be assigned prior to the dissolution and winding up of the limited partnership.").

[160] *See* JX 1 §§ 8.1, 8.2, 8.4, 5.3.

[161] *See* JX 1 § 11.1 ("**Notices.** All notices, demands, and communications (each, a **"Notice"**) required or provided for in this Agreement must be in writing.").

[162] Although CAIG did not prove by a preponderance of the evidence that it announced its dissociation before terminating the call, the Court assumes this occurred for purposes of this analysis.

[163] JX 78.

Requirements were in effect before CAIG's dissociation, and Catalyst properly applied the requirement to CAIG's 2019 PDI.

Finally, the Court finds unavailing Plaintiffs argument that the Minimum Origination Requirement is invalid because Catalyst did not apply it to Alyson Archer. Alyson Archer never originated or executed search projects for Catalyst because that was not part of her job responsibilities. She served Catalyst in a management capacity and was not eligible to receive performance-based compensation as its other partners were.[164] It logically follows that policy changes related to search projects would not affect her compensation, and the absence of application of those changes to her compensation is not evidence that the Minimum Origination Requirement never took effect.

### d. The LPA does not contemplate a partner being "grandfathered" into any policies.

In an argument that is more or less derivative and duplicative of the arguments addressed above, Plaintiffs further contend that they are "grandfathered" into the End-of-Year Bonus Policy that was in effect before adoption of the LIT Modification, the Difficult Search Modification, the Unpaid Invoice Deduction, and the Minimum Origination Policy.[165] Plaintiffs seem to contend that the LPA is ambiguous and that it reasonably can be read to provide that any changes to the

---

[164] JX 38; JX 68; Trial Tr. II at 270.

[165] Plaintiffs' Opening Br. at 50–51.

Policy that were not fully implemented at the time of Plaintiffs' dissociation did not apply to them.[166] In support of this theory, Plaintiffs point to extrinsic evidence in the LPA Slide Deck.[167] The slide Plaintiffs identify states that a majority of the Committee is required to "[c]hang[e] the End-of-Year Bonus Policy (When a partner leaves, they are grandfathered in to the plan that was in place as of the date of dissociation)[.]"[168] Further, Plaintiffs argue that "[b]ecause there is no signed writing detailing exactly what was agreed to, the Court must ascertain the shared intent of the parties to determine what, if any, changes were made to the End-of-Year Bonus Policy."[169]

Catalyst points out that the term "grandfather" is not located in the LPA and only appears in the LPA Slide Deck.[170] Catalyst contends that because the PowerPoint "was circulated prior to the execution of a full[y] integrated document, the LPA, the PowerPoint is irrelevant to Plaintiffs' claims."[171]

For all the reasons previously discussed, the Court disagrees with Plaintiffs' interpretation of the record and the LPA. The Court can discern no ambiguity in the relevant contractual language, and the Court may not look to extrinsic evidence to

---

[166] *Id.*

[167] *Id.* at 57 (citing JX 46).

[168] JX 46 at CATALYST000031.

[169] Plaintiffs' Opening Br. at 54.

[170] Defendant's Answering Br. at 13.

[171] *Id.* at 14.

36

find an ambiguity. The LPA expressly requires a Committee vote to approve changes to the End-of-Year Bonus Policy.[172] The LPA does not contain any other requirements for those changes to become effective. As previously discussed, because PDI could not be calculated until after the close of Catalyst's fiscal year, no policy change ever could be fully "implemented" until such time. If the partners intended Policy changes to be effective only upon full implementation, they would have expressly provided for that in the LPA. In the absence of such language, Policy modifications became effective upon approval and properly applied to partners who dissociated after approval.

The Court cannot revise contract terms after the fact, especially when the parties are sophisticated and willingly negotiated and accepted the terms of the LPA.[173] Further, "[t]he parol evidence rule bars the admission of evidence extrinsic

---

[172] JX 1 § 4.3(f) ("**Decisions Requiring Approval of a Majority of the Committee including the Managing Partner.** The Company shall not take any of the following actions without the majority approval of the Committee which shall include the approval of the Managing Partner: . . . (f) Changing the End-of-Year Bonus Policy.").

[173] *E.g.*, *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are **sophisticated** entities that have engaged in arms-length negotiations.") (emphasis added), *aff'd*, 2009 WL 4154356, 985 A.2d 391 (Del. Nov. 24, 2009); *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 2008 WL 571543, 945 A.2d 594 (Del. Mar. 4, 2008); *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006) ("[I]t is not the job of a court to relieve **sophisticated** parties of the burdens of contracts they wish they had drafted differently but in fact did not.") (emphasis added); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) ("A court must accept and apply the plain

to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract."[174] Nothing in Delaware law or the record permits this Court to conclude that the "grandfathering" mentioned on the slide overrides the LPA's unambiguous language. Accordingly, the Court finds that the End-of-Year Bonus Policy changes approved at the August 8, 2019 and October 21, 2019 meetings were effective upon approval by the Committee in compliance with the requirements of the LPA.

### 2. For purposes of Plaintiffs' PPP, "immediately prior 5 years" comprises 2015-2019.

The parties' final dispute regarding the PPP/PDI portion of the Buyout Formula relates to the proper time frame used to set a partner's PPP. Under the LPA, the PPP "is calculated by taking the average of the Partner's Profit Distribution Percentage over the *immediately prior 5 years* (or such shorter time if the dissociating Partner has dissociated prior to the 5th anniversary of becoming a Partner

---

meaning of an unambiguous term . . . in the contract language . . ., insofar as the parties would have agreed *ex ante*.").

[174] *Phillips v. Wilks, Lukoff & Bracegirdle, LLC*, 2014 WL 4930693, at *3 (Del. Oct. 1, 2014), *as corrected* (Oct. 7, 2014) (quoting *Galantino v. Baffone,* 46 A.3d 1076, 1081 (Del. 2012)); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *Restatement of Contracts* (Second), § 213, cmt. (a) ("[The parol evidence rule] renders inoperative prior written agreements as well as prior oral agreements.").

at the Company) from the date of dissociation."[175]  The parties disagree as to the meaning of "the immediately prior 5 years."

Plaintiffs contend that their PPP should be the average of their Partner's Profit Distribution Percentage for the years 2014 through 2018 and should **not** include the year the partner dissociated because the year of dissociation typically would not reflect a full year of a partner's profit share.  That calculation results in the following values:[176]

| CAIG | |
| --- | --- |
| 2014 | 12.27% |
| 2015 | 5.94% |
| 2016 | 10.57% |
| 2017 | 8.74% |
| 2018 | 5.87% |
| Average | 8.68% |

| Richards | |
| --- | --- |
| 2014 | 35.39% |
| 2015 | 40.99% |
| 2016 | 33.05% |
| 2017 | 33.44% |
| 2018 | 33.38% |
| Average | 35.25% |

---

[175] JX 1, Ex. C (emphasis added).

[176] PTO § II (B)(25)(a).

Catalyst, in contrast, argues that Plaintiffs' PPP should be the average of their Partner's Profit Distribution Percentage for the years 2015 through 2019, including the year the partner dissociated, resulting in the following values:[177]

| CAIG | |
| --- | --- |
| 2015 | 5.94% |
| 2016 | 10.57% |
| 2017 | 8.74% |
| 2018 | 5.87% |
| 2019 | 3.83% |
| Average | 6.99% |

| Richards | |
| --- | --- |
| 2015 | 40.99% |
| 2016 | 33.05% |
| 2017 | 33.44% |
| 2018 | 33.38% |
| 2019 | 10.90% |
| Average | 30.35% |

This Court finds that the plain meaning of "the immediately prior 5 years" is the most recent five years of a partner's Profit Distribution Percentage, which in this case means 2015-2019. Limited partnership agreements are a type of contract that courts construe "in accordance with their terms to give effect to the parties' intent. We give words their plain meaning unless it appears that the parties intended a

---

[177] PTO § II (B)(25)(b).

special meaning."[178]  Nothing in the text or structure of the LPA suggests that the parties intended the phrase "the immediately prior 5 years" to have any special meaning.

"Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."[179]  "Immediately" is given its usual meaning of "without interval of time."[180]  By its plain meaning, "immediately" encompasses the year that a partner dissociates.  To exclude the year of dissociation would permit an "interval of time" inconsistent with the meaning of the adverb "immediately."

Moreover, that interpretation is consistent with the Delaware courts' preference to adopt "an interpretation that harmonizes the provisions in a contract as opposed to one that creates an inconsistency or surplusage."[181]  The LPA expressly

---

[178] *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013) (citing *In re Nantucket Is. Assocs. Ltd. P'ship Unitholders Litig.,* 810 A.2d 351, 361 (Del. Ch. 2002); *AT&T Corp. v. Lillis,* 953 A.2d 241, 252 (Del. 2008)).

[179] *Lorillard Tobacco*, 903 A.2d at 738 (citing *Northwestern National Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 44 (Del. 1996) (using AMERICAN HERITAGE DICTIONARY (1969) to define "under" as "within the group or classification of" without further comment); *Hibbert v. Hollywood Park, Inc.,* 457 A.2d 339, 343 n.3 (Del. 1983) (using Webster's New International Dictionary (2d ed. unabr.1951) to define "party" without further comment); *The Cove on Herring Creek Homeowners' Ass'n v. Riggs,* 2005 WL 1252399, at *2 (Del. Ch. May 19, 2005) (applying definition from WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) to unambiguous, but disputed, language in a contract)).

[180] Immediately, *Merriam-Webster* (2024) https://www.merriam-webster.com/dictionary/immediately (Feb. 2, 2024).

[181] *GRT Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 12, 2012) (citing *Eagle Indus., Inc.,* 702 A.2d at 1232).

41

permits PPP to be calculated based on a shorter time period if a partner dissociates before the "5th anniversary of becoming a Partner."[182] Although the parties included this clarification, they did not specify that the shortened time period would include only the years in which the dissociated partner served a complete year. In the absence of any indication otherwise, the Court assumes that the parties intended to give the word "immediately" its ordinary meaning.

Plaintiffs complain that this result unfairly reduces a partner's historical profit share if the partner dissociates before the end of Catalyst's fiscal year.[183] A few brief responses suffice. First, the Court is charged with interpreting the contract's plain meaning, not with assessing the comparative fairness of the proffered interpretations. Second, the unfairness about which Plaintiffs complain is less than apparent to the Court. Under the LPA, a partner could choose when in the fiscal year to dissociate and could weigh within that analysis the benefits of dissociating mid-year against the downside of an incremental reduction to PPP. In contrast, Catalyst could not prevent a partner from dissociating and likely would need to adjust its business and compensation to accommodate that partner's exit. Therefore, it is reasonable to conclude that, in adopting the LPA, the partners intended to include within the

---

[182] JX 1, Ex. C.

[183] Plaintiffs' Answering Br. at 32.

42

calculation of PPP the lower Partner's Profit Distribution Percentage associated with a partial year's profit.

## B.    Enterprise Valuation

In addition to the parties' disagreements about calculating PDI and PPP, the parties also dispute the Buyout Formula's other input: Enterprise Valuation.  The parties disagree as to the meaning of Enterprise Valuation and which of their experts' calculations was proper under the LPA.

### 1.    Neither party's expert provided a reliable valuation.

Plaintiffs argue that Catalyst breached the LPA by improperly calculating Plaintiffs' buyout price based on a purported Enterprise Valuation that Plaintiffs argue is inconsistent with the LPA.[184]  Plaintiffs assert that the Enterprise Valuation for both Richards and CAIG should be $6,400,000 as set forth in the Egan Report.[185]

Catalyst argues that Plaintiffs fail to identify support in the evidentiary record or under the LPA for their proposed Enterprise Valuation.[186]  Catalyst contends that calculations for Enterprise Valuation should be based on the 2020 Report, which

---

[184] Plaintiffs' Opening Br. at 26.

[185] JX 61.

[186] Defendant's Answering Br. at 20.

valued Catalyst at $871,016 as of the date Richards dissociated and $817,811 as of the date CAIG dissociated.[187]

Although neither party focused on the issue, it would be reasonable to conclude that Plaintiffs bear the burden of proof with respect to Enterprise Valuation. Plaintiffs advanced this claim as a breach of contract claim, and a plaintiff generally bears the burden of proving all elements of a breach of contract claim, including damages.[188] On the other hand, the contract itself contemplates that Catalyst will participate in setting the Buyout Price.[189] Plaintiffs therefore could have argued that the parties shared the burden with respect to Enterprise Valuation, as in an appraisal case conducted under 8 *Del. C.* § 262.[190] But the question largely

---

[187] JX 30. The 2020 Report states that Richards' date of dissociation was October 4, 2019 and CAIG's date of dissociation was October 21, 2019. *Id.*

[188] *In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046, at *41 (Del. Ch. Sept. 28, 2021) ("The plaintiffs bore the burden of proving each element of the claim by a preponderance of the evidence."); *First State Constr., Inc. v. Thoro-Good's Concrete Co.*, 2010 WL 1782410, at *3 (Del. Super. May 3, 2010) ("In any breach of contract action, a plaintiff must prove each element by a preponderance of the evidence.").

[189] JX 1 § 8.4(e).

[190] *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 42 (Del. Ch. 2007) (quoting *M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999)). *See also Merion Cap. L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *12 (Del. Ch. Dec. 16, 2016) ("Each party also bears the burden of proving the constituent elements of its valuation position by a preponderance of the evidence, including the propriety of a particular method, modification, discount, or premium. If both parties fail to meet the preponderance standard on the ultimate question of fair value, the Court is required under the statute to make its own determination.") (quoting Jesse A. Finkelstein & John D. Hendershot, Appraisal Rights in Mergers & Consolidations, 38–5th C.P.S. §§ IV(H)(3), at A–89 to A–90 (BNA)).

is academic because, as explained below, neither side provided a persuasive expert valuation.

> ### a. The May 25, 2019 Sun Report is the report "on file" for purposes of Section 2.30, and an Enterprise Valuation must follow the methodologies in that report.

Before addressing the specifics of each side's proffered appraisal report, I first address the meaning of Enterprise Valuation under the LPA. Recall that a dissociated partner's buyout price is calculated by multiplying Catalyst's Enterprise Valuation and the partner's PPP. Enterprise Valuation means:

> . . . the appraised value of the Company, as illustrated by and in accordance with the methodology set forth in the Sun Valuation report on file with the Company, as may be updated from time to time, or as may be superseded by an appraisal report following the same methodology issued by another appraisal Company. [191]

Given this definition, it is necessary to identify what valuation report was "on file with the Company" for purposes of this case.[192]

Catalyst essentially argues the 2020 Report was "on file" because it is the most recent report prepared by Sun. Catalyst further contends that under the LPA, Sun was not required to follow its past methodologies when it "updated" its report.[193] This interpretation is not a reasonable one. Specifically, it is unreasonable to think

---

[191] JX 1 § 2.30.

[192] *Id.*

[193] Defendant's Opening Br. at 41–43; Defendant's Answering Br. at 20.

that the partners would have agreed to allow Catalyst to obtain a new report after a partner's dissociation and use that as the report "on file," thereby permitting Catalyst to change valuation methodologies without restraint as long as Sun prepared the new report.[194]

The 2020 Sun Report is not the report "on file" because Section 2.30 and Exhibit C of the LPA, read in conjunction, require the report to be "on file" at the time of a partner's dissociation.[195] The LPA's plain language supports this conclusion, and it is the only reasonable interpretation of the parties' agreement, which the Court must read as a whole.[196] In Exhibit C, PPP is calculated as 5 years immediately before the "date of dissociation."[197] This is the only date mentioned in the Buyout Formula, and it is sensible and consistent to apply the same date to all elements in the buyout calculation. This is not to say that either side could not obtain a new valuation for purposes of calculating a buyout. But that new valuation—whether prepared by Sun or another appraisal company—must follow the same methodology as the report on file at the date of dissociation.

---

[194] *See e.g.*, Defendant's Opening Br. at 41–42.

[195] JX 1 § 2.30, Ex. C.

[196] *Norton*, 67 A.3d at 360; *In re Nantucket Is. Assocs. Ltd. P'ship Unitholders Litig.*, 810 A.2d at 361; *Lillis*, 953 A.2d at 252.

[197] JX 1, Ex. C.

Perhaps even more unreasonably, Plaintiffs argue that an appraisal report prepared by any appraisal company other than Sun need not follow with the same degree of precision the methodology employed in the Sun Report "on file." Plaintiffs arrive at this interpretation by distinguishing between the LPA's use of "by and in accordance with" as compared to its use of "following the same methodology." Plaintiffs failed to coherently explain in their briefs and at oral argument the actual difference they ask this Court to distill from that language.[198] Perhaps realizing the hollowness of the proposed distinction, Plaintiffs go on to contend that the Egan Report nevertheless was prepared in accordance with Sun's May 2019 report.[199]

Accordingly, the report "on file" for purposes of Section 2.30 was the May 25, 2019 Report, which was the most recent Sun valuation prepared before Plaintiffs' dissociation. Plaintiffs argue that the report "on file" should be the May 16, 2019 draft report, but all the partners agreed to the May 25, 2019 Report and that valuation was used to calculate partner buy-in at the time. Given these facts, Sun's May 25, 2019 Report was the report "on file" at the time of dissociation and established the methodology to be applied to Catalyst's Enterprise Valuation for purposes of Plaintiffs' buyout.

---

[198] Plaintiffs' Opening Br. at 29–33.

[199] *Id.* at 33–34. Plaintiffs contend that the report on file at the time of dissociation is the draft May 16, 2019 Sun Valuation Report. *Id.* at 18, 27.

### b. The 2020 Report is not reliable.

Catalyst urges the Court to adopt as Catalyst's Enterprise Valuation the 2020 Report prepared by Sun and supported by the testimony of Thomas Theurkauf, Catalyst's expert at trial.[200] Catalyst asserts that the 2020 Report is the appropriate valuation for purposes of Plaintiffs' buyout for four primary reasons.[201] First, Catalyst contends that the 2020 Report was issued by Sun, and the LPA allows the report "on file" with Catalyst to be updated from "time to time."[202] Second, Catalyst asserts that the 2020 Report "appraises Catalyst consistent with the methodology of previous reports Sun issued because all the Sun reports valued Catalyst utilizing the Adjusted Book Value Method."[203] Third, Catalyst argues that only the 2020 Report "accounts for Plaintiffs' respective dissociations and the buyout and profit distribution related to the dissociations and bonuses owed to the remaining limited partners."[204] Finally, and with no small degree of *ipse dixit*, Catalyst argues that the 2020 Report is "on file" because Archer, the Managing Partner, says it is.[205]

---

[200] Defendant's Opening Br. at 41–42.

[201] *Id.*

[202] *Id.* at 41 (citing JX1; JX 30).

[203] *Id.* (citing JX 19; JX 22; JX 30). Catalyst argues the 2020 Report follows Sun's past methodologies while also arguing that the LPA does not require Sun to adhere to its past methodologies, even if it prepares an Enterprise Valuation report after a partner dissociates. As discussed above, that is not a reasonable reading of the LPA.

[204] *Id.* at 41–42 (citing JX 30).

[205] *Id.* at 42 (citing Trial Tr. III at 267–68).

The Court finds that the 2020 Report is not reliable for purposes of determining Catalyst's Enterprise Valuation for Plaintiffs' buyout.[206] The 2020 Report is litigation-driven. Plaintiffs filed their Complaint on June 5, 2020,[207] and the 2020 Report was prepared well after it was clear that the parties' business separation would not be an amicable one. The deductions and manipulations to Sun's valuation reflect this reality and ultimately render the report unreliable. Those deviations are not consistent with the partners' past practices for valuing Catalyst.

Three primary examples illustrate the point that the 2020 Report is not consistent with Sun's past methodology or the LPA. First, the 2020 Report reduces Catalyst's projected revenue to account for Plaintiffs' dissociation, which was not done in past valuations relied upon by the partners over the course of their association.[208] Theurkauf's and Catalyst's attempt to explain this change is unconvincing, and, more importantly, the deduction is inconsistent with the LPA's requirement that Enterprise Valuation follow the methodology of the report "on file." Second, the 2020 Report compounds this error by failing to account for goodwill and Catalyst's ability to bring in new partners to make up for revenue

---

[206] *See* JX 30.

[207] D.I. No. 1.

[208] Plaintiffs' Opening Br. at 36–37; Trial Tr. IV at 189–99. *Compare* JX 17 *and* JX 19 (February 2018 Sun Reports, which did not contemplate any discount for a downward effect due to a partner's dissociation), *with* JX 30 (the 2020 Report, which adjusts Enterprise Valuation downward for lost revenue attributable to the dissociating partners).

49

attributable to a dissociating partner.[209] The record supports the conclusion that there was a million dollars in goodwill on Catalyst's books that the 2020 Report did not consider when concluding that the brand had no intangible value.[210] Instead, the 2020 Report entirely discounts the likelihood that when a partner dissociates, new partners will join. Third, the 2020 Report treats Plaintiffs' buyout price as an accrued liability of the partnership, but that treatment is inconsistent with the LPA. Under the LPA's terms, Catalyst had no obligation to buy Plaintiffs' units.[211] Its choice to do so does not mean it can treat the buyout as a company liability that reduces the price of Plaintiffs' units.

### c. The Egan Report also is not reliable.

Egan's report (the "Egan Report")—which Plaintiffs ask the Court to rely on in calculating Enterprise Valuation—likewise is not a reliable valuation for several distinct reasons.[212]

First, Plaintiffs' position regarding Catalyst's Enterprise Valuation has shifted dramatically over the course of this litigation. Although perhaps not unusual, the

---

[209] Plaintiffs' Opening Br. at 37–38 (citing Trial Tr. III at 235–40; JX 43; JX 63).

[210] Trial Tr. III at 233–235.

[211] Plaintiffs' Opening Br. at 39–40 (citing Trial Tr. IV at 174–76, Trial Tr. III at 213–24, 229–32, Trial Tr. V at 189–90, 200); Plaintiffs' Answering Br. at 26–27. *See* JX 69 at CATALYST003997 *and* JX 70 at CATALYST004015 (emails dated April 30, 2020 to Richards and Bartholomew, respectively, expressing for the first time Catalyst's intent/agreement to buy back Plaintiffs' units). *See also* JX 1 § 8.4(a) (LPA which states that "[i]n the event of the . . . resignation[] of a Partner, the Company is entitled to, but not required, purchase the Partner's equity at the Buyout Price.").

[212] *See* JX 61.

shift—particularly the doubling of Plaintiffs' valuation, undermines confidence in the reliability of Plaintiffs' expert's methodology and conclusion. Plaintiffs' original complaint relied on the May 25, 2019 Sun Report for Enterprise Valuation.[213] At trial, however, Plaintiffs relied on Egan's valuation, which concludes Catalyst's Enterprise Value at the time of Plaintiffs' dissociation was $6,400,000, more than double Plaintiffs' original allegations.[214]

Moreover, the Egan Report does not, as it must under Section 2.30, follow the May 25, 2019 Sun Report's methodology.[215] The term "methodology" does not require a valuation company to ascribe the same weight to the different valuation approaches as Sun did in its reports. But Section 2.30's plain terms require the valuation company to consider the same valuation approaches and to adopt a consistent approach for deductions and projections. As with the 2020 Report, Egan fails to follow this requirement of the LPA.

For example, Egan failed to treat the partners' 2019 PDI as a liability that Catalyst owed to its partners. Accounting for liabilities that Catalyst owed to the partners was an element used by Sun in the past when determining Catalyst's

---

[213] D.I. 1 at ¶ 26 ("According to the Sun Valuation, Enterprise Valuation is $3,000,000."); JX 22.

[214] JX 61. In post-trial briefing and argument, Plaintiffs obliquely offered the May 16, 2019 Sun valuation as an alternative figure. *See, e.g.*, Plaintiffs' Opening Br. at 27.

[215] *See* JX 1 § 2.30 ("the appraised value of the Company, as illustrated by and in accordance with the methodology set forth in the Sun Valuation report on file with the Company. . .").

Enterprise Valuation.[216]  But because Plaintiffs contend that a report conducted by another appraisal company is not required to strictly follow Sun's past methodology, Plaintiffs excuse Egan's omission of this deduction without any principled explanation as to its appropriateness.  The Court finds that the Egan Report violates the LPA by failing to deduct 2019 PDI as a liability even though past reports had done so.[217]

Egan also included within his valuation a "reasonable compensation adjustment" that he failed to reliably justify in the context of Catalyst's business or Sun's past appraisal methodologies.  "The reasonable compensation adjustment seeks to adjust owner compensation (the limited partners) to a hypothetical amount intended to represent what the company would pay to a non-owner performing the same task with the same background."[218]  The Egan Report used a lower reasonable compensation number than that which Sun used in the past, which had the effect of inflating Catalyst's appraised value.[219]  Catalyst is "a small boutique firm," but the Egan Report's reasonable compensation adjustment relied on five publicly traded

---

[216] Defendant's Opening Br. at 45; JX 19; JX 22.  This is distinct from treating a partner's buyout as a liability which, as previously explained, was not consistent with the LPA.

[217] *See* JX 19; JX 22.

[218] Defendant's Opening Br. at 52 (citing JX 63 at 9) ("Generally, the lower the reasonable compensation number, the higher the value of the company as the EBITDA multiple is conversely related to the valuation analysis's adjustment for reasonable compensation.").

[219] *Id.* at 53 (citing JX 61 at 17).

companies that were 8 to 290 times Catalyst's size.[220] The Egan Report's reasonable compensation adjustment artificially inflates Catalyst's Enterprise Valuation and, as such, contributes to the Report's lack of reliability.

> ### d. The May 25, 2019 appraisal was accepted by all partners and represents Catalyst's "market" valuation.

Having concluded that neither party provided persuasive expert testimony supporting their proposed Enterprise Valuation, the Court is left to determine how to reliably calculate Catalyst's Enterprise Valuation for purposes of Plaintiffs' buyout price. The most reliable figure is Sun's May 25, 2019 valuation because: (i) all Catalyst's partners accepted it and relied upon it for purposes of determining a new partner's buy-in, (ii) it was obtained close in time to Plaintiffs' dissociations, and (iii) it was not manipulated by the parties' unreasonable litigation-driven positions.

Reliance on this market-tested valuation is consistent with Delaware precedent. The Delaware Supreme Court provides guidance "and regularly rests its appraisal analysis on the premise that when a transaction price represents an unhindered, informed and competitive market valuation, that price 'is at least first among equals of valuation methodologies in deciding fair value.'"[221] Although this

---

[220] JX 61 at 17; Defendant's Opening Br. at 52.

[221] *In re Appraisal of Jarden Corp.*, 2019 WL 3244085, at *23 (Del. Ch. July 19, 2019), *on reargument in part sub nom. In re Jarden Corp.*, 2019 WL 4464636 (Del. Ch. Sept. 16, 2019), and *aff'd sub nom. Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313 (Del. 2020) (quoting

is not an appraisal case, the principle holds; a recent valuation on which the parties relied to make business decisions before the litigation arose is representative of a "competitive market valuation" existing at the time Plaintiffs dissociated. Neither party has offered a more reliable calculation of Catalyst's Enterprise Valuation.

Reliance on this report also is in harmony with the LPA, which defines Enterprise Valuation as the Company's appraised value as "illustrated by" the "report on file with the Company, as may be updated from time to time, or as may be superseded by" another company's report "following the same methodology."[222] For the reasons explained above, the 2020 Report did not properly update the report on file, and Egan's Report did not supersede the report on file. Therefore, under the LPA's plain terms, Enterprise Valuation for purposes of Plaintiffs' buyout is the figure in the May 25, 2019 Report.

### 2. The Court does not need to resolve Plaintiffs' objection to Paulikens' report and testimony.

Plaintiffs objected before and during trial to the report and testimony of Catalyst's rebuttal expert, Randall Paulikens, "to the extent he offer[ed] a calculation of Enterprise Valuation or attempt[ed] to analyze the [2020 Report] because he [was]

---

and citing *In re Appraisal of AOL Inc.*, 2018 WL 1037450, at *1 (Del. Ch. Feb. 23, 2018); *In re Appraisal of PetSmart, Inc.*, 2017 WL 2303599, at *27 (Del. Ch. May 26, 2017) (collecting cases)).

[222] JX 1 § 2.30.

a rebuttal expert who offered no opinion by the applicable deadline in the CMO."[223]

Catalyst responded that Paulikens' report and testimony should be considered in full because his testimony was offered to rebut Egan's valuation and testimony.[224] Further, Catalyst contended that Paulikens did not provide any expert opinion as to Catalyst's Enterprise Valuation.[225] The Court reserved decision and allowed Paulikens to testify. Now, this issue is moot because the Court does not rely on either of the parties' experts or on any separate valuation Paulikens purported to offer.

### 3. CAIG's Capital Account Balance

In addition to buyout price, CAIG contends it had a positive capital account balance at the time it dissociated and that Catalyst is required to pay that amount under Section 8.5(a)(1)(ii) of the LPA. Because the parties do not dispute the balance in Richards' capital account when he dissociated,[226] only CAIG's account balance is at issue. Unlike the determination of buyout price, this dispute requires a straightforward determination of whether CAIG's capital account balance was greater than zero when it dissociated from Catalyst.[227] Like the other forms of

---

[223] Plaintiffs' Opening Br. at 41–47; PTO § XI(19).

[224] Defendant's Answering Br. at 28–31; PTO § XI(20).

[225] Defendant's Answering Br. at 28–31.

[226] PTO § II(B)(30).

[227] JX 1 § 8.5(a)(1)(ii) ("**Determination of Buyout Price.** The Buyout Price shall be calculated in accordance with Exhibit C, subject to adjustment as set forth in Section 8.4 and this Section 8.5:

recovery sought in this action, CAIG must prove by a preponderance of evidence that it is entitled to the positive balance that it demands.

The parties disagree as to what evidence the Court should rely on to determine whether CAIG possessed a positive balance in its capital account at the time of its dissociation. CAIG encourages this Court to adopt the account balance reflected in the 2020 Sun Report—$79,181.[228] According to CAIG, because Sun attributed a positive balance to CAIG's capital account, and because Catalyst relies on the 2020 Sun Report in other respects, Catalyst effectively admitted that CAIG possessed a positive capital account balance upon dissociation.[229] Catalyst, on the other hand, points to CAIG's 2019 Schedule K-1, which reflects a capital account balance of $0.[230]

Delaware courts previously have relied on a company's tax returns to resolve similar questions. *In re Dissolution of Jeffco Management, LLC*[231] is instructive. There, the Court of Chancery held that a company's Schedule K-1 was a "reliable indicator" as to whether a partner possessed a capital account balance.[232] That is so

---

(1) With respect to an Initial Partner . . . (ii) the Initial Partner's positive capital account balance (excluding the Original Capital Contribution) as of the date of Dissociation[.]").

[228] JX 30 at 18.

[229] Plaintiffs' Answering Br. at 2.

[230] Defendant's Opening Br. at 27; JX 90 at 1.

[231] *In re Dissolution of Jeffco Mgmt., LLC*, 2021 WL 3611788, at *6 (Del. Ch. Aug. 16, 2021).

[232] *Id.*

because tax returns are signed and submitted under penalty of perjury.[233]  Moreover, although the partnership itself may be responsible for preparing Schedule K-1s, unless a partner can show that it was denied access to the tax documents, any failure to dispute the information within the document signals a partner's acknowledgment that the information is accurate.[234]  CAIG offers no caselaw to the contrary.

The facts here are analogous to those in *Jeffco*.  CAIG's 2019 Schedule K-1 confirms that CAIG did not possess a positive capital account balance upon its dissociation in 2019.[235]  Testimony at trial also established that CAIG never: (i) disputed the contents of the 2019 K-1, (ii) sought to amend the 2019 K-1, or (iii) notified Catalyst's accountants that it believed the 2019 K-1 was incorrect.[236]  Although Bartholomew testified that he relied on Catalyst to prepare CAIG's K-1s,[237] this position is unconvincing because, as explained above, if CAIG believed the K-1 reflected incorrect information, it should have requested changes to the information.

CAIG also contends that because Catalyst relies on the 2020 Sun Report for its Enterprise Valuation argument, it should not be able to distance itself from the

---

[233] *Id.*

[234] *Id.*

[235] JX 90 at 1; Trial Tr. IV at 142–143.

[236] Trial Tr. I at 118.

[237] JX 90*; see also* Trial Tr. I at 116–118.

same document's account balance information.[238] But this argument misses the mark for two reasons. First, this Court already has declined to rely on the 2020 Report. Second, CAIG argues that the positive capital account balance listed in the 2020 Sun Report is an admission by a party opponent and therefore sufficient to satisfy CAIG's burden of proof.[239] A party opponent's admission may make a piece of evidence admissible under the hearsay rules, but it does not address how relevant, probative, or ultimately convincing a piece of evidence is in meeting the burden of proof.[240]

Accordingly, this Court follows the Court of Chancery's sound reasoning in *Jeffco*.[241] CAIG's failure to amend or request an amendment to the 2019 K-1 belies CAIG's argument that the K-1 is inaccurate. Because CAIG's 2019 K-1 confirms that CAIG did not possess a positive balance upon its dissociation from Catalyst, and CAIG fails to convincingly identify other evidence that could serve to refute the K-1, this Court adopts the 2019 K-1 as the most reliable evidence of whether CAIG possessed a positive balance upon dissociation. Accordingly, CAIG has failed to prove that it is entitled to any additional funds relating to this claim.

---

[238] Plaintiffs' Answering Br. at 2.

[239] *Id*.

[240] D.R.E. 801(d)(2)(A).

[241] *Cede & Co. v. Technicolor, Inc*., 1990 WL 161084, at *25 (Del. Ch. Oct. 19, 1990).

## 4. Fee Shifting

Finally, Plaintiffs advance several reasons to support their argument that Catalyst engaged in bad faith litigation that warrants fee shifting.[242] First, Plaintiffs argue that because Catalyst's buyout letters failed to provide an Enterprise Valuation and buyout calculation, Catalyst acted in bad faith.[243] Catalyst avers that the "bad faith" exception cannot apply because it sent Plaintiffs the buyout letters nearly two months before litigation commenced.[244] Second, Plaintiffs contend that Catalyst acted in bad faith because it obtained and relied upon the 2020 Sun Report.[245] In response, Catalyst asserts that its reliance on the 2020 Sun Report merely reflects the two sides' disagreement regarding the merits of this suit.[246] Third, Plaintiffs argue that Catalyst deliberately created the LIT and Difficult Search Modifications in bad faith to target Richards.[247] Catalyst contends that this argument is "disingenuous" because Plaintiffs participated in all relevant meetings and votes.[248] Further, Catalyst asserts that its implementation of modifications permitted by the

---

[242] Plaintiffs' Opening Br. at 37–40.

[243] *Id.*

[244] Defendant's Opening Br. at 36.

[245] Plaintiffs' Opening Br. at 48.

[246] Defendant's Opening Br. at 37.

[247] Plaintiffs' Opening Br. at 48–49.

[248] Defendant's Opening Br. at 37–38.

LPA cannot result in a finding of bad faith.[249]  Finally, Plaintiffs assert that John and Alyson Archer testified insincerely, pointing to differences between Richards' and John Archer's testimony regarding the "Genocea" search status report.[250]

None of Plaintiffs' arguments offers a convincing basis for fee shifting. Delaware follows the American Rule, under which litigants generally are responsible for paying their own litigation costs.[251]  Courts recognize "limited equitable exceptions" to the American Rule, including one for a party's "bad faith" conduct throughout litigation.[252]  Although there exists no all-encompassing definition of "bad faith" conduct, Delaware courts have awarded attorneys' fees where a party has "unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims."[253]  In Delaware, the "bad faith" exception applies only in "extraordinary cases."[254]  Its purpose is "to deter abusive litigation and protect the integrity of the judicial process."[255]  To prevent the exception from

---

[249] *Id.* at 38.

[250] Plaintiffs' Opening Br. at 49.

[251] *Mahani v. Edix Media Group, Inc.*, 935 A.2d 242, 245 (Del. 2007).

[252] *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).

[253] *Johnston*, 720 A.2d at 546.

[254] *Brice v. State Dept. of Correction*, 704 A.2d 1176, 1179 (Del. 1998).

[255] *Montgomery*, 880 A.2d at 227.

swallowing the rule, Delaware courts require a moving party to prove bad faith with "clear evidence."[256]

Plaintiffs have failed to present clear evidence that Catalyst's conduct rose to the level of bad-faith litigation tactics. Plaintiffs and Catalyst each prevailed in different portions of this litigation. Plaintiffs' arguments reflect nothing more than each party taking opposing positions throughout litigation and do not bring this case within the scope of "extraordinary cases" that support a finding of bad faith. Accordingly, Plaintiffs' request for attorneys' fees is denied.

## IV. CONCLUSION

This Court enters judgment in favor of Plaintiffs to the extent and on the basis set forth herein. If there are any open issues not addressed by this post-trial opinion, the parties shall notify the Court by letter within five days. If no such letter is filed, the parties shall confer and prepare a proposed form of final order within 20 days, setting forth the principal amount to which each Plaintiff is entitled based on the Court's rulings, along with pre- and post-judgment interest. The appeal period for this post-trial opinion shall not begin to run until the final order is entered as an order of the Court.

---

[256] *Arbitrium (Cayman Is.) Handels AG v. Johnston*, 705 A.2d 225, 232 (Del. Ch. 1997).